# APPENDIX B

 Illinois Union Insurance Company

# ACE DigiTech <sup>SM</sup>
## Digital Technology & Professional Liability Insurance Policy
### Declarations

**This Policy is issued by the stock insurance company listed above.**

THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD AND WHICH ARE THE RESULT OF WRONGFUL ACTS COMMITTED ON OR AFTER THE RETROACTIVE DATE BUT BEFORE THE END OF THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.

THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED DAMAGES SHALL BE REDUCED BY AMOUNTS INCURRED FOR CLAIMS EXPENSES. FURTHER NOTE THAT AMOUNTS INCURRED FOR DAMAGES AND CLAIMS EXPENSES SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

TERMS THAT APPEAR IN BOLD FACE TYPE HAVE SPECIAL MEANING. PLEASE REFER TO SECTION II, DEFINITIONS.

---

**Policy No.** EON G24066496 002      **Renewal of:** EON G24066496 001

**Item 1. Named Insured**
Principal Address:

Sitel Worldwide Corporation
Two American Center
3102 West End Avenue, Suite 100
Nashville, TN 37203-1324

**Item 2. Policy Period:**

From: 12:01 a.m. 04/01/2010      To: 12:01 a.m. 04/01/2011
(Local time at the address shown in Item 1)

**Item 3. Coverage(s) Purchased (☒):**

| | | |
|---|---|---|
| ☒ | A. | Technology and **Internet** Errors & Omissions Liability |
| ☒ | B. | **Electronic Media Activities** Liability |
| ☒ | C. | **Network Operations Security** Liability |
| ☒ | D. | Privacy Liability |
| ☒ | E. | Identify Theft Public Relations Expense Fund |
| ☒ | F. | **Cyber Extortion Threat** |
| ☒ | G. | **Miscellaneous Professional Services** Liability |

**Item 4. Limit of Liability (including Claims Expenses):**
A. Limit of Liability for Coverage(s) Purchased:

| | Each Claim | Aggregate |
|---|---|---|
| A. Technology and **Internet** Errors and Omissions Liability | $15,000,000 | $15,000,000 |
| B. **Electronic Media Activities** Liability | $15,000,000 | $15,000,000 |
| C. **Network Operations Security** Liability | $15,000,000 | $15,000,000 |
| D. Privacy Liability (subject to **Regulatory Proceeding** sublimit) | $15,000,000 | $15,000,000 |
| E. Identify Theft Public Relations Expense Fund | $1,000,000 | $1,000,000 |
| F. **Cyber Extortion Threat** | $15,000,000 | $15,000,000 |
| G. **Miscellaneous Professional Services** Liability | $15,000,000 | $15,000,000 |

---

NAFS 000002

|  |  |  |  |
|---|---|---|---|
| B. | Regulatory Proceeding Sub-Limit of Liability: | $5,000,000 | $5,000,000 |
| C. | Maximum Policy Aggregate Limit of Liability | | $15,000,000 |

**Item 5.** Retention:

$1,000,000 Each Claim for Coverages A, B, C, D and G (if selected)

$250,000     Each Claim for Coverage E (If selected)

$1,000,000 Each Claim for Coverages F (if selected)

**Item 6.** Notice to Insurer:

    Director of Claims
    ACE Professional Risk
    P.O. Box 5105
    Scranton, PA 18505-0518
    ProfessionalLiabilityFirstNotice@acegroup.com

    B.    In the event of a **Network Extortion Threat** where urgent crisis management support is required, please contact:

    ACE USA Professional Risk Claims Hotline: 1 (800) 523-9254

    C.    All other notices:
    Chief Underwriting Officer
    ACE USA - Professional Risk
    140 Broadway, 41st Floor
    New York, New York 10005

**Item 7.** **Policy Premium:** ▬▬▬▬▬

**Item 8.** **Miscellaneous Professional Services** (applicable only to Coverage G, if selected):

Inbound and outbound sales/telemarketing/technical support, response processing , mail order services, interactive voice media, direct mail campaigns, facilities management, list compilation and list management, catalog fulfillment services, lead-management services, continuity/club fulfillment, data-mining services, change of address programs, customer service and mail/fax response processing, reporting services, client financial services, list brokerage and list, maintenance, distribution/fulfillment services, database management and merge/purge, providing operating and managing contact centers, providing contact centre and customer management services (using various communication channels including telephone, facsimile, white mail, text messaging, e-mail, web chat, ivr, internet channels in person and other related means of communication or delivery), inbound and outbound customer service and care, sales (including the sale of insurance products and services that may or may not require an insurance agent's license), technical /computer support and help desk services, customer management and business process outsourcing and back office support, providing contact center system integration, contact center and customer, management program design and planning services, mortgage broker services, loan administration/processing services, debt collection services or similar or related services for third parties all for others for a fee or for commission.

**Item 9.** Optional **Extended Reporting Period:**

    A.    Additional Premium:    100% of Annual Premium
    B.    Additional Period:    12 Month(s)

Item 10.  **Retroactive Date:**

A.  Technology and **Internet** Errors and Omissions Liability

| May 01, 1985 | Client Logic Corporation | ($10M xs $5M) – January 30 2007 |

B.  **Electronic Media Activities** Liability

| May 01, 1985 | Client Logic Corporation | ($10M xs $5M) – January 30 2007 |

C.  **Network Operations Security** Liability

| May 01, 1985 | Client Logic Corporation | ($10M xs $5M) – January 30 2007 |

D.  Privacy Liability (subject to **Regulatory Proceeding** sublimit)

| May 01, 1985 | Client Logic Corporation | ($10M xs $5M) – January 30 2007 |

E.  Identity Theft Public Relations Expense Fund

| May 01, 1985 | Client Logic Corporation | ($10M xs $5M) – January 30 2007 |

F.  **Cyber Extortion Threat**

| May 01, 1985 | Client Logic Corporation | ($10M xs $5M) – January 30 2007 |

G.  **Miscellaneous Professional Services** Liability

| May 01, 1985 | Client Logic Corporation | ($10M xs $5M) – January 30 2007 |

IN WITNESS WHEREOF, the **Insurer** has caused this **Policy** to be countersigned by a duly authorized representative of the **Insurer**.

DATE: _____ May 19, 2010

JOHN J. LUPICA, President

_____
Authorized Representative

 **Illinois Union Insurance Company**

# ACE DigiTech[SM]
## Digital Technology & Professional
## Liability Insurance Policy

In consideration of the payment of the premium, in reliance upon the **Application**, and subject to the Declarations and the terms and conditions of this **Policy**, the **Insureds** and the **Insurer** agree as follows:

I.   INSURING AGREEMENTS

A.   Technology and **Internet** Errors and Omissions Liability

If Insuring Agreement A, Technology and **Internet** Errors and Omissions Liability coverage, is purchased pursuant to Item 3 of the Declarations, the **Insurer** will pay **Damages** and **Claims Expenses** of the **Insured** which the **Insured** becomes legally obligated to pay by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

B.   **Electronic Media Activities** Liability

If Insuring Agreement B, **Electronic Media Activities** Liability coverage, is purchased pursuant to Item 3 of the Declarations, the **Insurer** will pay **Damages** and **Claims Expenses** of the **Insured** which the **Insured** becomes legally obligated to pay by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

C.   **Network Operations Security** Liability

If Insuring Agreement C, **Network Operations Security** Liability coverage, is purchased pursuant to Item 3 of the Declarations, the **Insurer** will pay **Damages** and **Claims Expenses** of the **Insured** which the **Insured** becomes legally obligated to pay by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

D.   Privacy Liability

If Insuring Agreement D, Privacy Liability coverage, is purchased pursuant to Item 3 of the Declarations, the **Insurer** will pay **Damages** and **Claims Expenses** of the **Insured** which the **Insured** becomes legally obligated to pay by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

E.   Identity Theft Public Relations Expense Fund

If Insuring Agreement E, Identity Theft Public Relations Expense Fund coverage, is purchased pursuant to Item 3 of the Declarations, the **Insurer** will pay **Crisis Management Expenses** incurred by the **Insured** during the **Policy Period** by reason of a **Claim** reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

F.   **Cyber Extortion Threat**

If Insuring Agreement F, **Cyber Extortion Threat** coverage, is purchased pursuant to Item 3 of the Declarations, the **Insurer** will pay **Extortion Monies** and **Extortion Expenses** incurred by the **Insured** by reason of a **Claim** first made against the **Insured** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

G.   **Miscellaneous Professional Services** Liability

If Insuring Agreement G, **Miscellaneous Professional Services** Liability coverage, is purchased pursuant to Item 3 of the Declarations, the **Insurer** will pay **Damages** and **Claims Expenses** of the **Insured** which the **Insured** becomes legally obligated to pay by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

NAFS 000005

II.    DEFINITIONS

When used in this **Policy**:

A.    **Advertising** means promotional material (including branding, co-branding, sponsorships and endorsements), publicly disseminated on any **Internet Website** on behalf of the **Insured**.

B.    **Advertising Services** means promotional material (including branding, co-branding, sponsorships and endorsements), publicly disseminated by the **Insured** on the **Insured's Internet Website** on behalf of others.

C.    **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** or any policy of which this **Policy** is a direct or indirect renewal or replacement. All such applications, attachments, information and materials are deemed attached to and incorporated into this **Policy**.

D.    **Bodily Injury** means injury to the body, sickness, or disease, and death. **Bodily Injury** also means mental injury, mental anguish, mental tension, emotional distress, pain and suffering, or shock, whether or not resulting from injury to the body, sickness, disease or death of any person.

However, **Bodily Injury** does not mean mental injury, mental anguish, mental tension, emotional distress, pain and suffering, or shock resulting from a **Wrongful Act** for which coverage is provided under Section I, Insuring Agreements B or D.

E.    **Claim** means:

1.    with respect to Insuring Agreements A, B, C, D, and G:

a.    a written demand against any **Insured** for monetary or non-monetary damages;

b.    a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

c.    an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief;

2.    also, with respect to Insuring Agreement D only, a **Regulatory Proceeding**;

3.    with respect to E, a written report by the **Insured** to the **Insurer** of an actual or alleged violation of any **Privacy Regulations** by the **Insured**;

4.    with respect to Insuring Agreement F, a **Cyber Extortion Threat**,

including any appeal therefrom.

F.    **Claims Expenses** means:

1.    reasonable and necessary attorneys' fees, expert witness fees and other fees and costs incurred by the **Insurer,** or by the **Insured** with the **Insurer's** prior written consent, in the investigation and defense of a covered **Claim;**

2.    reasonable and necessary premiums for any appeal bond, attachment bond or similar bond, provided the **Insurer** shall have no obligation to apply for or furnish such bond; and

3.    prejudgment and post judgment interest awarded in any **Claim.**

**Claims Expenses** shall not include wages, salaries, fees or costs of directors, officers or employees of the **Insurer** or the **Insured.**

G.    **Computer System** means computer hardware, software, and the data stored thereon, as well as associated input and output devices, data storage devices, networking equipment and electronic backup facilities.

H.    **Crisis Management Expenses** means those reasonable and necessary legal expenses, public relations expenses and related compensatory expenses (including, but not limited to, the costs of credit monitoring services provided to affected individuals) approved by the **Insurer** and incurred by the **Insured** as a result of any actual or potential violation of any **Privacy Regulations.**

I.   **Cyber Extortion Threat** means any credible threat or series of related threats (including a demand for **Extortion Monies**) directed at the **Insured** by anyone, other than an **Insured** or by someone induced or assisted by an **Insured**, to:

    1.  release, divulge, disseminate, destroy or use the confidential information of a third party taken from the **Insured** as a result of **Unauthorized Access** to or **Unauthorized Use** of the **Insured's Computer System**;

    2.  introduce **Malicious Code** into the **Insured's Computer System**;

    3.  corrupt, damage or destroy the **Insured's Computer System**; or

    4.  restrict or hinder access to the **Insured's Computer System**, including but not limited to the threat of a **Denial of Service Attack**.

J.   **Damages** means compensatory damages, any award of prejudgment or post-judgment interest, and settlements which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against any **Insured** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for **Wrongful Acts** to which this **Policy** applies. **Damages** shall not include:

    1.  any amount for which the **Insured** is not financially liable or legally obligated to pay;

    2.  taxes, fines, penalties, or sanctions;

    3.  matters uninsurable under the laws pursuant to which this **Policy** is construed;

    4.  the cost to comply with any injunctive or other non-monetary or declaratory relief, including specific performance, or any agreement to provide such relief;

    5.  loss of fees or profits by the **Insured**, return of fees, commissions or royalties by the **Insured**, or re-performance of services by the **Insured** or under the **Insured's** supervision;

    6.  disgorgement of any profit, remuneration or financial advantage to which any **Insured** was not legally entitled;

    7.  penalties of any nature, however denominated, arising by contract; and

    8.  any amounts other than those intended solely to compensate for a loss caused by a **Wrongful Act**.

    **Damages** include punitive and exemplary damages to the extent such damages are insurable under the most favorable internal laws of any jurisdiction which has a substantial relationship to the **Insured**, the **Insurer**, this **Policy** or such **Claim**.

K.   **Denial of Service Attack** means an event that is caused by a third party's malicious activity directed at the **Insured** which restricts or prevents access to an **Internet Website** or other network resource by other third parties authorized to gain access to that **Website** or resource.

L.   **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Insured**.

M.   **Electronic Content** means any data, text, sounds, images or similar matter disseminated electronically, including but not limited to **Advertising and Advertising Services**, and including matter disseminated electronically on the **Insured's Internet Website**. However, **Electronic Content** shall not include data, text, sounds, images or similar matter incorporated into or otherwise a part of **Technology Products**.

N.   **Electronic Media Activities** means the electronic publishing, dissemination, releasing, gathering, transmission, production, webcasting, or other distribution of **Electronic Content** on the **Internet** on behalf of the **Insured** or by the **Insured** for others.

O.   **Extended Reporting Period** means the period(s) for the extension of coverage, if applicable, described in Section V, **Extended Reporting Periods**.

P.   **Extortion Expenses** means reasonable and necessary expenses incurred by the **Insured**, with the **Insurer's** written consent, that directly result from a **Cyber Extortion Threat**, other than **Extortion Monies**.

Q.   **Extortion Monies** means monies paid by the **Insured**, with the **Insurer's** written consent, to a person or persons reasonably believed to be responsible for a **Cyber Extortion Threat** for the purpose of terminating that **Cyber Extortion Threat**.

R.   **Hacker Attack** means the **Unauthorized Use** of or **Unauthorized Access** to a **Computer System** other than the **Insured's Computer System.**

S.   **Insured** means:

  1.  The **Named Insured;**

  2.  **Subsidiaries** of the **Named Insured**, but only if they are listed on the **Application** for this **Policy**, and only with respect to **Wrongful Acts** which occur while they are a **Subsidiary;**

  3.  any past, present or future principal, partner, officer, director, trustee or employee of the **Named Insured** or **Subsidiary**, but only with respect to the commission of a **Wrongful Act** committed within the scope of such person's duties performed on behalf of the **Named Insured** or **Subsidiary;** and

  4.  independent contractors of the **Named Insured** or of a **Subsidiary** who are natural persons, but only with respect to the commission of a **Wrongful Act** within the scope of such person's duties performed on behalf of the **Named Insured** or **Subsidiary.**

T.   **Insured's Computer System** means a **Computer System:**

  1.  leased, owned, or operated by the **Insured;** or

  2.  operated solely for the benefit of the **Insured** by a third party service provider under written contract with the **Insured.**

U.   **Insurer** means the insurance company providing this insurance.

V.   **Internet** means the worldwide public network of computers which enables the transmission of electronic data and which includes intranets, extranets and virtual private networks.

W.   **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

X.   **Malicious Code** means unauthorized, corrupting or harmful software code, including but not limited to computer viruses, Trojan horses, keystroke loggers, cookies, spyware, adware, worms and logic bombs.

Y.   **Mediation** means a non-binding process in which a neutral panel or individual assists the parties in reaching a settlement agreement. To be considered **Mediation** under this **Policy**, the process must be as set forth in the Commercial Mediation Rules of the American Arbitration Association, or such other process as the **Insurer** may, at its sole option, approve.

Z.   **Miscellaneous Professional Services** means only those services specified in Item 8 of the Declarations and performed for others for a fee by the **Insured**, or by any person or entity acting on behalf of the **Insured. Miscellaneous Professional Services** do not include **Technology Services, Electronic Media Activities** or **Network Operations Security.**

AA.   **Named Insured** means the organization or natural person first specified in Item 1 of the Declarations.

BB.   **Network Operations Security** means those activities performed by the **Insured,** or by others on behalf of the **Insured,** to protect against **Unauthorized Access** to and the **Unauthorized Use** of the **Insured's Computer System,** or to protect against a **Denial of Service Attack.**

CC.   **Personal Information** means an individual's name in combination with any one or more of the following:

  1.  social security number;

  2.  medical or healthcare data, or other protected health information;

  3.  drivers license number or state identification number;

  4.  account number, credit card number or debit card number in combination with any required security code, access code or password that would permit access to that individual's financial account, or

  5.  other nonpublic **Personal Information** as defined in **Privacy Regulations.**

  **Personal Information** shall not include information that is lawfully made available to the general public for any reason, including information from federal, state or local government records.

DD.   **Personal Injury** means injury arising out of one or more of the following offenses:

- false arrest, detention or imprisonment;
- malicious prosecution;
- libel, slander, or other defamatory or disparaging material;
- publication or an utterance in violation of an individual's right to privacy; and
- wrongful entry or eviction, or other invasion of the right to private occupancy.

EE. **Policy** means, collectively, the Declarations, **Application**, this policy form and any endorsements.

FF. **Policy Period** means the period of time specified in Item 2 of the Declarations, subject to prior termination pursuant to Section XIII, Termination of the **Policy**.

GG. **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials, including materials to be recycled, reconditioned, or reclaimed. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field.

HH. **Privacy Regulations** means the following statutes and regulations associated with the control and use of personally identifiable financial, medical or other sensitive information:

1. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191);
2. Gramm-Leach-Bliley Act of 1999;
3. the California Security Breach Notification Act (CA SB 1386), and
4. other similar state, federal, and foreign identity theft and privacy protection legislation that requires commercial entities that collect **Personal Information** to post privacy policies, adopt specific privacy controls, or notify individuals in the event that **Personal Information** has potentially been compromised.

II. **Property Damage** means:

1. physical injury to, or loss or destruction of, tangible property, including the loss of use thereof; and
2. loss of use of tangible property which has not been physically injured, lost, damaged or destroyed.

However, **Property Damage** does not mean physical injury to, loss or destruction of, or loss of use of intangible property, including data.

JJ. **Regulatory Proceeding** means a request for information, demand, suit, civil investigation or civil proceeding by or on behalf of a government agency, commenced by a service of a complaint or similar pleading and alleging the violation of **Privacy Regulations** as a result of the **Insured's Wrongful Act**, and which may reasonably be expected to give rise to a covered **Claim** under Insuring Agreement D of this **Policy**.

KK. **Retroactive Date** means the date specified in Item 10 of the Declarations.

LL. **Subsidiary** means any entity that is not formed as a partnership or joint venture of which the **Named Insured** owns or has the right to vote more than 50% of the outstanding voting securities representing the present right to vote for election of directors, or the managers or members of the board of managers or equivalent executives of a limited liability company, on or before the inception date of the **Policy**, either directly or indirectly, in any combination, by one or more other **Subsidiaries**.

MM. **Technology Products** means computer or telecommunications hardware, software, or related electronic equipment, including the design, development, manufacturing, assembly, distribution, licensing, leasing, sale, installation, repair or maintenance thereof.

NN. **Technology Services** means:

1. information technology consulting and information systems or network analysis, design, programming or integration;

2. database design and the caching, collecting, compiling, processing, mining, or recording or analysis of data; and

3. other related services, including:

    a. information system outsourcing;

    b. **Website** design, programming or maintenance;

    c. information system or **Website** hosting;

    d. **Internet** access services;

    e. **Internet** search or navigational tool provision;

    f. Electronic mail services; and

    g. application software services delivery.

OO. **Trade Secret** means information, including a formula, pattern, compilation, program, device, method, technique or process, that derives independent economic value, actual or potential, from not being generally known to or readily ascertainable by other persons who can obtain value from its disclosure or use, so long as reasonable efforts have been made to maintain its secrecy.

PP. **Unauthorized Access** means the gaining of access to a **Computer System** by an unauthorized person or persons, or by an authorized person or persons in an unauthorized manner.

QQ. **Unauthorized Use** means the use of a **Computer System** by an unauthorized person or persons or an authorized person in an unauthorized manner.

RR. **Website** means the software, content and other materials accessible via the **Internet** at a designated Uniform Resource Locator address.

SS. **Wrongful Act** means any error, misstatement, misleading statement, act, omission, neglect, breach of duty, or **Personal Injury** offense actually or allegedly committed or attempted by any **Insured** in their capacity as such, or by any other **Insured** solely in the performance of duties for the **Named Insured**:

1. With respect only to Insuring Agreement A, in:

    a. the **Insured's** rendering or failure to render **Technology Services** to others for a fee, or

    b. the failure of the **Insured's Technology Products** to perform the function or serve the purpose intended.

2. With respect only to Insuring Agreement B, in the course of the provision of **Electronic Media Activities**, including:

    a. any form of defamation or other tort related to the disparagement or harm to the reputation or character of any person or organization, including libel, slander, product disparagement, trade libel, infliction of emotional distress, mental anguish, outrage or outrageous conduct;

    b. invasion, infringement or interference with the right to privacy or publicity, including false light, public disclosure of private facts, or the intrusion and commercial appropriation of a name, persona or likeness;

    c. plagiarism, piracy, or the misappropriation or unauthorized use of advertising ideas, advertising material, titles, literary or artistic formats, styles or performances;

    d. the infringement of copyright, domain name, trademark, trade name, trade dress, title or slogan, service mark, or service name; or

    e. negligence with respect to the **Insured's** creation or dissemination of **Electronic Content**.

3. With respect only to Insuring Agreement C, in the conduct of **Network Operations Security** that results in:

    a. the failure to prevent **Unauthorized Access** to or **Unauthorized Use** of the **Insured's Computer System**, that in turn results in:

        i.   the theft, alteration or destruction of data, or

        ii.   **Hacker Attacks** against third parties;

    b.   the denial of authorized users' access to the **Insured's Computer System**, unless such denial of access is caused by a mechanical or electrical failure;

    c.   the failure to prevent the participation by the **Insured's Computer System** in a **Denial of Service Attack** directed against the **Computer System** of a third party; or

    d.   the failure to prevent the transmission of **Malicious Code** from the **Insured's Computer System** to the **Computer System** of a third party.

4.   With respect only to Insuring Agreement D, in:

    a.   the failure by the **Insured** or by an independent contractor for which the **Insured** is legally responsible to properly handle, manage, store, destroy or otherwise control:

        i.   **Personal Information** in any format; or

        ii.   third party corporate information in any format specifically identified as confidential and protected under a nondisclosure agreement or similar contract;

    b.   an unintentional violation of the **Insured's** privacy policy that results in the violation of any **Privacy Regulation**.

5.   With respect only to Insuring Agreement E, in any actual or potential violation of any **Privacy Regulations** by the **Insured**.

6.   With respect only to Insuring Agreement F, in the **Insured's** conduct of **Network Operations Security** that results in a **Cyber Extortion Threat**.

7.   With respect only to Insuring Agreement G, in the **Insured's** rendering or failure to render **Miscellaneous Professional Services** to others for a fee.

TT.   **Wrongful Employment** Practices means any actual or alleged:

- wrongful dismissal or discharge or termination of employment, whether actual or constructive;

- employment-related misrepresentation;

- violation of any federal, state, or local laws (whether common or statutory) concerning employment or discrimination in employment;

- sexual harassment or other unlawful workplace harassment;

- wrongful deprivation of a career opportunity or failure to employ or promote;

- wrongful discipline of employees;

- retaliation against employees for the exercise of any legally protected right or for engaging in any legally protected activity;

- negligent evaluation of employees;

- failure to adopt adequate workplace or employment policies and procedures;

- employment-related libel, slander, or defamation;

- employment-related invasion of privacy, except with respect to that part of any **Claim** arising out of the loss of **Personal Information** which is otherwise covered under Insuring Agreement D of this **Policy**;

- employment-related wrongful infliction of emotional distress, except with respect to that part of any **Claim** arising out of the loss of **Personal Information** which is otherwise covered under Insuring Agreement D of this **Policy**;

- any actual or alleged discrimination, sexual harassment, or violation of a natural person's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

The foregoing definitions shall apply equally to the singular and plural forms of the respective words.

III.     EXCLUSIONS

The **Insurer** shall not be liable for **Damages, Claims Expenses, Crisis Management Expenses, Extortion Monies, or Extortion Expenses** on account of any **Claim**:

A.     alleging, based upon, arising out of or attributable to any dishonest, fraudulent, criminal, malicious or intentional act, error or omission, or any intentional or knowing violation of the law by an **Insured**. However, this exclusion shall not apply to **Claims Expenses** or the **Insurer's** duty to defend any such **Claim** until there is a judgment against, binding arbitration against, adverse admission by, finding of fact against, or plea of *nolo contendere* or no contest by the **Insured**, at which time the **Insured** shall reimburse the **Insurer** for any **Claims Expenses** paid by the **Insurer**. This exclusion shall not apply to **Wrongful Acts** expressly covered under Section I, Insuring Agreements C or D, but only if such **Wrongful Acts** were not committed by, or with the knowledge of, any principal, partner, officer or director of the **Insured**.

B.     alleging, based upon, arising out of or attributable to any **Bodily Injury** or **Property Damage**.

C.     for breach of any express, implied, actual or constructive contract, warranty, guarantee, or promise, including any actual or alleged liability assumed by the **Insured**, unless such liability would have attached to the **Insured** even in the absence of such contract, warranty, guarantee, or promise. This exclusion will not apply to that part of a **Claim** alleging the unintentional failure to perform **Technology Services** or **Miscellaneous Professional Services** with a reasonable standard of care and consistent with industry standards.

D.     alleging, based upon, arising out of or attributable to the provision of **Technology Services, Electronic Media Activities** or **Miscellaneous Professional Services**, or **Technology Products**, for any entity if at the time these services were performed or products provided:

     1.    any **Insured**, or any other natural person or entity for whom or which an **Insured** is legally liable, was a partner, director, officer or employee of such entity; or

     2.    any **Insured**, or any other natural person or entity for whom or which an **Insured** is legally liable, owned, directly or indirectly, 10% or more of any such entity if it was a publicly held company, or 30% or more of any such entity if it was a privately held company.

E.     brought or maintained by, on behalf of, or in the right of any **Insured**, or any other natural person or entity for whom or which an **Insured** is legally liable. However, this exclusion shall not apply to **Wrongful Acts** expressly covered under Section I, Insuring Agreement D.

F.     alleging, based upon, arising out of or attributable to any:

     1.    illegal discrimination of any kind;

     2.    humiliation, harassment or misconduct based upon, arising out of or related to any such discrimination;

     3.    **Wrongful Employment Practices**.

G.     alleging, based upon, arising out of or attributable to any price fixing, restraint of trade, monopolization, unfair trade practices or other violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes, or any similar provision of any federal, state, or local statutory law or common law anywhere in the world.

H.     alleging, based upon, arising out of or attributable to the violation of:

     1.    the Employee Retirement Income Security Act of 1974, as amended;

     2.    the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisors Act, or any other federal, state or local securities law,

any rules or regulations promulgated thereunder, amendments thereof, or any similar federal, state or common law.

I.    alleging, based upon, arising out of or attributable to the gaining in fact of any profit, remuneration or financial advantage to which any **Insured** was not legally entitled. However, this exclusion shall not apply to **Claims Expenses** or the **Insurer's** duty to defend any such **Claim** until there is a judgment against, binding arbitration against, adverse admission by, finding of fact against, or plea of *nolo contendere* or no contest by the **Insured**, at which time the **Insured** shall reimburse the **Insurer** for any **Claims Expenses** paid by the **Insurer**.

J.    alleging, based upon, arising out of or attributable to any fees, expenses, or costs paid to or charged by the **Insured**.

K.    alleging, based upon, arising out of or attributable to a **Wrongful Act** actually or allegedly committed prior to the beginning of the **Policy Period** if, on or before the earlier of the effective date of this **Policy** or the effective date of any **Policy** issued by the **Insurer** of which this **Policy** is a continuous renewal or a replacement, the **Insured** knew or reasonably could have foreseen that the **Wrongful Act** did or could lead to a **Claim**.

L.    alleging, based upon, arising out of, or attributable to:

1.    any prior or pending litigation, **Claims**, demands, arbitration, administrative or regulatory proceeding or investigation filed or commenced on or before the earlier of the inception date of this **Policy** or any other policy of which this is a renewal, replacement or succeeds in time, or alleging or derived from the same or substantially the same fact, circumstance or situation underlying or alleged therein; or

2.    any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** underlying or alleged therein would constitute **Interrelated Wrongful Acts**.

M.    alleging, based upon, arising out of, or attributable to:

1.    any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy before the effective date of this **Policy**; or

2.    any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**.

N.    alleging, based upon, arising out of or attributable to:

1.    the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

2.    any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so.

O.    alleging, based upon, arising out of or attributable to any electrical or mechanical failures or interruption, including but not limited to any electrical disturbance, surge, spike, brownout or blackout, and outages to gas, water, telephone, cable, satellite, telecommunications or other infrastructure.

However, this exclusion shall not apply to failures, interruptions, disturbances or outages of telephone, cable or telecommunications infrastructure under the **Insured's** operational control which are a result of:

1.    the **Insured's Wrongful Act**; or

2.    a **Denial of Service Attack**.

P.    alleging, based upon, arising out of or attributable to any failure, interruption, or outage to **Internet** access service provided by the **Internet** service provider that hosts the **Insured's Website**, unless such infrastructure is under the **Insured's** operational control.

However, this exclusion shall not apply to Insuring Agreement F.

Q.    alleging, based upon, arising out of or attributable to the inaccurate, inadequate, or incomplete description of the price of goods, products or services, the disclosure of fees, the failure to meet deadlines, or as a result of the **Insured's** cost guarantees, cost representations, contract price, pricing guarantees or estimates of probable costs or cost estimates being exceeded, or any guarantee or promise of costs savings, return on investment, or profitability.

R.    alleging, based upon, arising out of or attributable to fire, smoke, explosion, lightning, wind, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or any other physical event, however caused.

S.     alleging, based upon, arising out of or attributable to war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war is declared or not), strike, lock-out, riot, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power.

T.     alleging, based upon, arising out of or attributable to the inability to use, or lack of performance of, software programs:

　　　　1.   due to the expiration or withdrawal of technical support by the software vendor; or

　　　　2.   that are in development, or are in 'beta' or similar testing stage, and/or have not yet been authorized for general commercial release.

U.     alleging, based upon, arising out of or attributable to any costs or expenses incurred by any **Insured** or others to recall, repair, replace, upgrade, supplement or remove the **Insured's** products, including products which incorporate the **Insured's** products or services from the marketplace.

V.     alleging, based upon, arising out of or attributable to the manufacturing, mining, use, sale, installation, removal, distribution of or exposure to asbestos, materials or products containing asbestos, asbestos fibers or dust.

W.     alleging, based upon, arising out of or attributable to the planning, construction, maintenance, operation or use of any nuclear reactor, nuclear waste, storage or disposal site, or any other nuclear facility; the transportation of nuclear material, or any nuclear reaction or radiation, or radioactive contamination, regardless of its cause.

X.     alleging, based upon, arising out of or attributable to false, deceptive or unfair business practices, violation of consumer protection laws, or false or deceptive advertising. However, this exclusion shall not apply to **Claims Expenses** or the **Insurer's** duty to defend any such **Claim** until there is a judgment against, binding arbitration against, adverse admission by, finding of fact against, or plea of *nolo contendere* or no contest by the **Insured**, at which time the **Insured** shall reimburse the **Insurer** for any **Claims Expenses** paid by the **Insurer**.

Y.     alleging, based upon, arising out of or attributable to any validity, invalidity, infringement, violation or misappropriation of any patent or **Trade Secret**.

Z.     alleging, based upon, arising out of or attributable to any validity, invalidity, infringement, violation or misappropriation of any copyright, service mark, trade name, trademark or other intellectual property of any third party. However, this exclusion shall not apply to Section I, Insuring Agreement B.

AA.    alleging, based upon, arising out of or attributable to the development of **Electronic Content** by the **Insured** for others, in the performance of **Advertising Services**.

BB.    alleging, based upon, arising out of or attributable to any unsolicited electronic dissemination of faxes, e-mails or other communications to multiple actual or prospective customers of the **Insured**, any **Subsidiary**, or any other third party, including but not limited to actions brought under the Telephone Consumer Protection Act, any federal or state anti-spam statutes, and/or any other federal or state statute, law or regulation relating to a person's or entity's right of seclusion.

CC.    alleging, based upon, arising out of or attributable to any action brought by or on behalf of the Federal Trade Commission, the Federal Communications Commission, or any other federal, state, or local government agency or ASCAP, SESAC, BMI or other licensing or rights organizations in such entity's regulatory, quasi-regulatory, or official capacity, function or duty. This exclusion shall not apply to **Wrongful Acts** expressly covered under Section I, Insuring Agreement D.

DD.    alleging, based upon, arising out of or attributable to the failure of any digital rights management software or other copy protection mechanism incorporated into the **Insured's Technology Products**.

EE.    alleging, based upon, arising out of or attributable to the unauthorized collection of **Personal Information** by the **Insured**, including but not limited to the collection of **Personal Information** using cookies, spyware or other **Malicious Code** or the failure to provide adequate notice that such information is being collected.

FF.    alleging, based upon, arising out of or attributable to the **Insured's** intentional failure to disclose the loss of **Personal Information** in violation of any law or regulation.

IV.     ESTATES, LEGAL REPRESENTATIVES AND SPOUSES

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of **Insureds** shall be considered **Insureds** under this **Policy**, but coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retention shown in Item 5 of the Declarations applicable to **Damages, Claims Expenses, Crisis Management Expenses, Extortion Monies**, or **Extortion Expenses** incurred by **Insureds**, shall also apply to **Damages, Claims Expenses, Crisis Management Expenses, Extortion Monies**, or **Extortion Expenses** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

V.     EXTENDED REPORTING PERIODS

If the **Insurer** terminates or does not renew this **Policy** (other than for failure to pay a premium when due), or if the **Named Insured** terminates or does not renew this **Policy** and does not obtain replacement coverage as of the effective date of such termination or nonrenewal, the **Named Insured** shall have the right, upon payment of the additional premium described below, to a continuation of the coverage granted by this **Policy** for at least one **Extended Reporting Period** as follows:

A.     Automatic **Extended Reporting Period**

The **Named Insured** shall have continued coverage granted by this **Policy** for a period of 60 days following the effective date of such termination or nonrenewal, but only for **Claims** first made during such 60 days and arising from **Wrongful Acts** taking place prior to the effective date of such termination or nonrenewal. This Automatic **Extended Reporting Period** shall immediately expire upon the purchase of replacement coverage by the **Named Insured**.

B.     Optional **Extended Reporting Period**

The **Named Insured** shall have the right, upon payment of the additional premium set forth in Item 9A of the Declarations, to an Optional **Extended Reporting Period**, for the period set forth in Item 9B of the Declarations following the effective date of such termination or nonrenewal, but only for **Claims** first made during such Optional **Extended Reporting Period** and arising from **Wrongful Acts** taking place prior to the effective date of such termination or nonrenewal.

This right to continue coverage shall lapse unless written notice of such election is given by the **Named Insured** to the **Insurer**, and the **Insurer** receives payment of the additional premium within 60 days following the effective date of termination or nonrenewal.

The first 60 days of the Optional **Extended Reporting Period**, if it becomes effective, shall run concurrently with the Automatic **Extended Reporting Period**.

C.     The **Insurer** shall give the **Named Insured** notice of the premium due for the Optional **Extended Reporting Period** as soon as practicable following the date the **Named Insured** gives such notice of such election, and such premium shall be paid by the **Named Insured** to the **Insurer** within 10 days following the date of such notice by the **Insurer** of the premium due. The Optional **Extended Reporting Period** is not cancelable and the entire premium for the Optional **Extended Reporting Period** shall be deemed fully earned and non-refundable upon payment.

D.     The Automatic and Optional **Extended Reporting Periods** shall be part of and not in addition to the Limit of Liability for the immediately preceding **Policy Period**. The Automatic and Optional **Extended Reporting Periods** shall not increase or reinstate the Limit of Liability, which shall be the maximum liability of the **Insurer** for the **Policy Period** and the Automatic and Optional **Extended Reporting Period**, combined.

E.     A change in **Policy** terms, conditions, exclusions and/or premiums shall not be considered a nonrenewal for purposes of triggering the rights to the Automatic or Optional **Extended Reporting Period**.

VI.     LIMITS OF LIABILITY

Regardless of the number of Insuring Agreements purchased under this **Policy**, **Insureds** against whom **Claims** are brought, **Claims** made or persons or entities making **Claims**:

A.  Limit of Liability for Insuring Agreement(s) Purchased

1.  With respect to Insuring Agreements A, B, C, D and G:

a.  the Each **Claim** Limit of Liability stated in Item 4A of the Declarations for a purchased Insuring Agreement is the **Insurer's** maximum liability under that Insuring Agreement for the sum of all **Damages** and all **Claims Expenses** because of each **Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

b.  the Aggregate Limit of Liability stated in Item 4A of the Declarations for a purchased Insuring Agreement is the **Insurer's** maximum liability under that Insuring Agreement for the sum of all **Damages** and all **Claims Expenses** because of all **Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

2.  With respect to Insuring Agreement E:

a.  the Each **Claim** Limit of Liability stated in Item 4A of the Declarations for Insuring Agreement E is the **Insurer's** maximum liability under that Insuring Agreement for the sum of all **Crisis Management Expenses** because of each **Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

b.  the Aggregate Limit of Liability stated in Item 4A of the Declarations for Insuring Agreement E is the **Insurer's** maximum liability under that Insuring Agreement for the sum of all **Crisis Management Expenses** because of all **Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

3.  With respect to Insuring Agreement F:

a.  the Each **Claim** Limit of Liability stated in Item 4A of the Declarations for Insuring Agreement F is the **Insurer's** maximum liability under that Insuring Agreement for the sum of all **Extortion Monies** and **Extortion Expenses** because of each **Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

b.  the Aggregate Limit of Liability stated in Item 4A of the Declarations for Insuring Agreement F is the **Insurer's** maximum liability under that Insuring Agreement for the sum of all **Extortion Monies** and **Extortion Expenses** because of all **Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

4.  With respect to Insuring Agreement D only, and notwithstanding the otherwise applicable Each **Claim** and Aggregate Limits of Liability stated in Item 4A of the Declarations:

a.  The Each **Claim Regulatory Proceeding** Sub-Limit of Liability stated in Item 4B of the Declarations is the **Insurer's** maximum liability under Insuring Agreement D for the sum of all **Damages** and all **Claims Expenses** incurred because of each **Regulatory Proceeding Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

b.  The Aggregate **Regulatory Proceeding** Sub-Limit of Liability stated in Item 4B of the Declarations is the **Insurer's** maximum liability under Insuring Agreement D for the sum of all **Damages** and all **Claims Expenses** incurred because all **Regulatory Proceeding Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

The **Regulatory Proceeding** Sub-Limit of Liability shall be part of and not in addition to the otherwise applicable Each **Claim** or Aggregate Limits of Liability stated in Item 4A of the Declarations, and will not increase the **Insurer's** Limit of Liability as provided therein.

5.  All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

6. **Claims Expenses**, **Crisis Management Expenses**, and **Extortion Expenses** shall be part of and not in addition to the applicable Aggregate Limit of Liability stated in Item 4A of the Declarations, and shall reduce such Aggregate Limit of Liability. If the applicable Limit of Liability is exhausted by payment of **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, or **Extortion Expenses**, the obligations of the **Insurer** under this **Policy** shall be completely fulfilled and extinguished. The **Insurer** is entitled to pay **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, and **Extortion Expenses** as they become due and payable by the **Insureds**, without consideration of other future payment obligations.

B. Maximum **Policy** Aggregate Limit of Liability

The Maximum **Policy** Aggregate Limit of Liability stated in Item 4C of the Declarations is the **Insurer's** maximum liability under all Insuring Agreements purchased for the sum of all **Damages**, all **Claims Expenses**, all **Crisis Management Expenses**, all **Extortion Monies**, and all **Extortion Expenses** because of all **Claims** under this **Policy**.

C. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**. All **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, and **Extortion Expenses** resulting from a single **Claim** shall be deemed, respectively, a single **Damage**, **Claims Expense**, **Crisis Management Expense**, **Extortion Money**, or **Extortion Expense**.

D. **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies** and **Extortion Expenses** shall be part of and not in addition to the applicable Limit(s) of Liability shown in Item 4C of the Declarations, and **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, and **Extortion Expenses** shall reduce such Limit(s) of Liability. If the Limit(s) of Liability are exhausted by payment of **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, or **Extortion Expenses**, the obligations of the **Insurer** under this **Policy** shall be completely fulfilled and extinguished.

VII. RETENTION

A. The liability of the **Insurer** shall apply only to that part of **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, and **Extortion Expenses** which are in excess of the applicable Retention amount shown in Item 5 of the Declarations. Such Retention shall be borne uninsured by the **Named Insured** and at the risk of all **Insureds**.

B. A single Retention amount shall apply to **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, and **Extortion Expenses** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

C. If different parts of a single **Claim** are subject to different Retentions, the applicable Retention shall be applied separately to each part of the **Damages**, **Claim Expenses**, **Crisis Management Expenses**, **Extortion Monies**, and **Extortion Expenses**, but the sum of such Retentions shall not exceed the largest applicable Retention.

VIII. NOTICE

A. The **Insured** shall, as a condition precedent to their rights under this **Policy**, give to the **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than 30 days after the later of the end of the **Policy Period**, the **Automatic Extended Reporting Period**, or, if elected, the Optional **Extended Reporting Period**.

B. If, during the **Policy Period**, any **Insured** becomes aware of any specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds** give written notice to the **Insurer** during the **Policy Period**, the Automatic **Extended Reporting Period**, or, if elected, the Optional **Extended Reporting Period** of:

1. the identity of the potential claimants;

2. a description of the anticipated **Wrongful Act** allegations;

3. the identity of the **Insureds** allegedly involved;

4. the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

NAFS 000017

5. the consequences which have resulted or may result; and

6. the nature of the potential monetary damages;

then any **Claim** which arises out of such **Wrongful Act** shall be deemed to have been first made at the time such written notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

C. All notices under any provision of this **Policy** shall be in writing and given by prepaid express courier or certified mail properly addressed to the appropriate party. Notice to the **Insureds** may be given to the **Named Insured** at the address shown in Item 1 of the Declarations. Notice of any **Claim** or **Wrongful Act** shall be given to the **Insurer** at the address set forth in Item 6A of the Declarations. Urgent crisis management requests shall be submitted to the **Insurer** at the hotline set forth in Item 6B of the Declarations. All other notices under this **Policy** shall be given to the **Insurer** at the address set forth in Item 6C of the Declarations. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee, or one day following the date such notice is sent, whichever is earlier.

D. No notice that may be given during the **Policy Period** under section VIII, Notice, at subsection B may be given during the **Extended Reporting Periods**, if elected.

IX. DEFENSE AND SETTLEMENT

A. The **Insurer** shall have the right and duty to defend any covered **Claim**, except for a **Regulatory Proceeding**, brought against the **Insured** even if such **Claim** is groundless, false or fraudulent. The **Insurer** shall have the right, but not the duty, to defend any **Regulatory Proceeding**. The **Insured** shall not admit or assume liability or settle or negotiate to settle any **Claim** or incur any **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, or **Extortion Expenses** without the prior written consent of the **Insurer**, and the **Insurer** shall have the right to appoint counsel and to make such investigation and defense of a covered **Claim** as it deems necessary.

B. The **Insurer** shall not settle any **Claim** without the written consent of the **Named Insured**. If the **Named Insured** refuses to consent to a settlement or a compromise recommended by the **Insurer** and acceptable to the claimant, then the **Insurer's** Limit of Liability under this **Policy** with respect to such **Claim** shall be reduced to the amount of **Damages** for which the **Claim** could have been settled plus all **Claims Expenses** incurred up to the time the **Insurer** made its recommendation to the **Named Insured**, which amount shall not exceed that portion of any applicable Aggregate Limit of Liability that remains unexhausted by payment of **Damages** and **Claims Expenses**, or by any combination thereof.

C. The **Insurer** shall not be obligated to investigate, defend, pay or settle, or continue to investigate, defend, pay or settle any **Claim** after any applicable Limit of Liability specified in Item 4 of the Declarations has been exhausted by payment of **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, or **Extortion Expenses** or by any combination thereof, or after the **Insurer** has deposited the remainder of any unexhausted applicable Limit of Liability into a court of competent jurisdiction. In either such case, the **Insurer** shall have the right to withdraw from the further investigation, defense, payment or settlement of such **Claim** by tendering control of such **Claim** to the **Insured**.

D. The **Insured** shall cooperate with the **Insurer**, and provide to the **Insurer** all information and assistance which the **Insurer** reasonably requests including but not limited to attending hearings, depositions and trials and assistance in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting the defense of any **Claim** covered by this **Policy**. The **Insured** shall do nothing that may prejudice the **Insurer's** position. The **Insureds** shall immediately forward to the **Insurer**, at the address indicated in Item 6A of the Declarations, every demand, notice, summons, or other process or pleading received by the **Insured** or its representatives.

X. OTHER INSURANCE

If any **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, or **Extortion Expenses** covered under this **Policy** are covered under any other valid and collectible insurance, then this **Policy** shall cover such **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, or **Extortion Expenses** subject to the **Policy** terms and conditions, only to the extent that the amount of such **Damages**, **Claims Expenses**, **Crisis Management Expenses**, **Extortion Monies**, or **Extortion Expenses** are in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided by this **Policy**.

XI.   MATERIAL CHANGES IN CONDITIONS

    A.   Acquisition or Creation of Another Organization

        If, during the **Policy Period**, the **Named Insured**:

        1.   acquires voting securities in another organization or creates another organization, which as a result of such acquisition or creation becomes a **Subsidiary**; or

        2.   acquires any organization by merger into or consolidation with the **Named Insured**;

        then, subject to the terms and conditions of this **Policy**, such organization shall be covered under this **Policy** but only with respect to **Claims** for **Wrongful Acts** taking place after such acquisition or creation, unless the **Insurer** agrees to provide coverage by endorsement for **Wrongful Acts** taking place prior to such acquisition or creation.

        If the total assets of such acquired organization, as reflected in the then most recent consolidated financial statements of the organization, exceeds 10% of the total assets of the **Named Insured** and the **Subsidiaries** as reflected in the then most recent consolidated financial statements of the **Named Insured**, the **Named Insured**, as a condition precedent to coverage with respect to such **Insureds**, shall, no later than 60 days after the effective date of such acquisition or creation:

        1.   give written notice of such acquisition or creation to the **Insurer**;

        2.   pay any additional premium required by the **Insurer**; and

        3.   agree to any additional terms and conditions of this **Policy** as required by the **Insurer**.

    B.   Acquisition of the **Named Insured**

        If, during the **Policy Period**, any of the following events occurs:

        1.   the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or

        2.   the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least 50% of the directors of the **Named Insured**;

        then coverage under this **Policy** will continue in full force and effect until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts** taking place before such event. Coverage under this **Policy** will cease as of the effective date of such event with respect to **Claims** for **Wrongful Acts** taking place after such event. This **Policy** may not be cancelled after the effective time of the event, and the entire premium for this **Policy** shall be deemed earned as of such time.

    C.   Termination of a **Subsidiary**

        If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to the **Subsidiary** and its **Insured Persons** shall continue until termination of this **Policy**. Such coverage continuation shall apply only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**.

XII.   REPRESENTATIONS

    A.   The **Insureds** represent and acknowledge that the statements and information contained in the **Application**, including all information provided concerning network security policies and procedures, information management policies and procedures, and business continuity plans and policies, are true and accurate and:

        1.   are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy**; and

        2.   shall be deemed material to the acceptance of this risk or the hazard assumed by the **Insurer** under this **Policy**.

    B.   It is understood and agreed that:

        1.   this **Policy** is issued in reliance upon the truth and accuracy of such representations;

        2.   the **Insureds** have and will provide accurate information with regard to loss control audits and network security assessments as required by the **Insurer**; and

3. if such representations or such information are not true, accurate and complete, this **Policy** shall be null and void in its entirety and the **Insurer** shall have no liability hereunder.

XIII. TERMINATION OF THE POLICY

A. This **Policy** shall terminate at the earliest of the following times:

1. the effective date of termination specified in a prior written notice by the **Named Insured** to the **Insurer**;

2. 30 days after receipt by the **Named Insured** of a written notice of termination from the **Insurer**;

3. 10 days after receipt by the **Named Insured** of a written notice of termination from the **Insurer** for failure to pay a premium when due, unless the premium is paid within such 10 day period;

4. upon expiration of the **Policy Period** as set forth in Item 2 of the Declarations; or

5. at such other time as may be agreed upon by the **Insurer** and the **Named Insured**.

B. If the **Policy** is terminated by the **Named Insured**, the **Insurer** shall refund the unearned premium computed at the customary short rate. If the **Policy** is terminated by the **Insurer**, the **Insurer** shall refund the unearned premium computed *pro rata*. Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

XIV. TERRITORY AND VALUATION

A. All premiums, limits, retentions, **Damages, Claims Expenses, Crisis Management Expenses, Extortion Monies, Extortion Expenses** and other amounts under this **Policy** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of loss under this **Policy** is stated in a currency other than United States of America dollars, payment under this **Policy** shall be made in United States dollars at the applicable rate of exchange as published in *The Wall Street Journal* as of the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of loss is due, respectively, or, if not published on such date, the next date of publication of *The Wall Street Journal*.

B. Coverage provided under this **Policy** shall extend to **Wrongful Acts** and **Claims** taking place, brought or maintained anywhere in the world.

XV. SUBROGATION

In the event of any payment under this **Policy**, the **Insurer** shall be subrogated to the extent of such payment to all the rights of recovery of the **Insureds**. The **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit or otherwise pursue subrogation rights in the name of the **Insureds**.

XVI. ACTION AGAINST THE INSURER AND BANKRUPTCY

Except as provided in Section XIX, Alternative Dispute Resolution, no action shall lie against the **Insurer**. No person or organization shall have any right under this **Policy** to join the **Insurer** as a party to any action against any **Insured** to determine the liability of the **Insured** nor shall the **Insurer** be impleaded by any **Insured** or its legal representatives. Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve the **Insurer** of its obligations nor deprive the **Insurer** of its rights or defenses under this **Policy**.

XVII. AUTHORIZATION CLAUSE

By acceptance of this **Policy**, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the giving of notice of **Claim**, the giving or receiving of notice of termination or non renewal, the payment of premiums, the receiving of any premiums that may become due under this **Policy**, the agreement to and acceptance of endorsements, consenting to any settlement, exercising the right to the **Extended Reporting Period**, and the giving or receiving of any other notice provided for in this **Policy**; and all **Insureds** agree that the **Named Insured** shall so act on their behalf.

XVIII. ALTERATION, ASSIGNMENT AND HEADINGS

Notice to any agent or knowledge possessed by any agent or by any other person shall not affect a waiver or a change in any part of this **Policy** nor prevent the **Insurer** from asserting any right under the terms of this **Policy**.

A.  No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**.

B.  The titles and headings to the various parts, sections, subsections and endorsements of the **Policy** are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such parts, sections, subsections or endorsements.

XIX.  ALTERNATIVE DISPUTE RESOLUTION

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process set forth in this Section.

Either an **Insured** or the **Insurer** may elect the type of ADR process discussed below; provided, however, that the **Insured** shall have the right to reject the choice by the **Insurer** of the type of ADR process at any time prior to its commencement, in which case the choice by the **Insured** of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding **Mediation** administered by any **Mediation** facility to which the **Insurer** and the **Insured** mutually agree, in which the **Insured** and the **Insurer** shall try in good faith to settle the dispute by **Mediation** in accordance with the then-prevailing commercial **Mediation** rules of the **Mediation** facility; or (2) arbitration submitted to any arbitration facility to which the **Insured** and the **Insurer** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either **Mediation** or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of **Mediation**, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until at least 60 days after the date the **Mediation** shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either ADR process may be commenced in New York, New York or in the state indicated in Item 1 of the Declarations as the principal address of the **Named Insured**. The **Named Insured** shall act on behalf of each and every **Insured** in connection with any ADR process under this Section.

XX.  INTERPRETATION

The terms and conditions of this **Policy** shall be interpreted and construed in an evenhanded fashion as between the parties. If the language of this **Policy** is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant terms and conditions, without regard to authorship of the language, without any presumption or arbitrary interpretation or construction in favor of either the **Insureds** or the **Insurer** and without reference to the reasonable expectations of either the **Insureds** or the **Insurer**.



**ace usa**

# U.S. Treasury Department's Office
# Of Foreign Assets Control ("OFAC")
# Advisory Notice to Policyholders

This Policyholder Notice shall not be construed as part of your policy and no coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

NAFS 000022

# TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured<br>**Sitel Worldwide Corporation** | | | Endorsement Number<br>**1** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G24066496 002** | Policy Period<br>**04/01/2010 to 04/01/2011** | Effective Date of Endorsement<br>**04/01/2010** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims.

All other terms and conditions remain unchanged.

JOHN J. LUPICA, President

Authorized Representative

# SIGNATURE ENDORSEMENT

| Named Insured<br>**Sitel Worldwide Corporation** | | | Endorsement Number<br>**2** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G24066496 002** | Policy Period<br>**04/01/2010  to 04/01/2011** | Effective Date of Endorsement<br>**04/01/2010** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract when countersigned by our authorized representative.

### ILLINOIS UNION INSURANCE COMPANY
525 W. Monroe Street, Suite 400, Chicago, Illinois 60661

GEORGE D. MULLIGAN, Secretary                    JOHN J. LUPICA, President

### WESTCHESTER SURPLUS LINES INSURANCE COMPANY
500 Colonial Center Parkway, Suite 200, Roswell, GA 30076

GEORGE D. MULLIGAN, Secretary                    DENNIS A. CROSBY, JR., President

JOHN J. LUPICA, President
Authorized Agent

LD-5S23g  (2/05) Ptd. in U.S.A.

## SERVICE OF SUIT ENDORSEMENT

| Named Insured<br>**Sitel Worldwide Corporation** | | | Endorsement Number<br>3 |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G24066496 002** | Policy Period<br>**04/01/2010 to 04/01/2011** | Effective Date of Endorsement<br>**04/01/2010** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Information about service of "suits" upon us is given below. Service of process of "suits" against us may be made upon the following person, or another person we may designate:

> Saverio Rocca, Assistant General Counsel
> ACE USA Companies
> P.O. Box 1000
> 436 Walnut Street, WA04K
> Philadelphia, PA 19106

The person named above is authorized and directed to accept service of process on our behalf in any action, "suit" or proceeding instituted against us. If you request, we will give you a written promise that a general appearance will be entered on our behalf if a "suit" is brought.

If you request, we will submit to the jurisdiction of any court of competent jurisdiction. We will accept the final decision of that court or any Appellate Court in the event of an appeal.

The law of some jurisdictions of the United States of America require that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as our agent for service of process. In these jurisdictions, we designate the Director of Insurance as our true and lawful attorney upon whom service of process on our behalf may be made. We also authorize the Director of Insurance to mail process received on our behalf to the company person named above.

If you are a resident of Canada, you may also serve "suit" upon us by serving the government official designated by the law of your province.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

JOHN J. LUPICA, President
_____
Authorized Representative

XS-1U96e (02/06) (Readable)

NAFS 000025

# DEFINITION OF MISCELLANEOUS PROFESSIONAL SERVICES AMENDED ENDORSEMENT

| Named Insured<br>**Sitel Worldwide Corporation** | | | Endorsement Number<br>4 |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G24066496 002** | Policy Period<br>**04/01/2010  to 04/01/2011** | Effective Date of Endorsement<br>**04/01/2010** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

It is agreed that Section, II, Definitions, subsection Z, the definition of **Miscellaneous Professional Services**, is amended by adding the following:

Solely with respect to those services:

1. that the **Insured**, or any person or entity acting on behalf of the **Insured**, first commences to perform for other for a fee or other compensation after the effective date of this endorsement and that were never performed by the **Insured** or such person or entity prior to such date (hereinafter "**New Services**"); and

2. solely in the even such **New Services** are not specified in Item 8 of the Declarations,

then such **New Services** are included in the definition of **Miscellaneous Professional Services** provided that such services occurred or allegedly occurred within fifteen (15) days after the date on which the **Insured**, or any person or entity acting on behalf of the **Insured**, first commences to perform such **New Services** for others for a fee or other compensation (hereinafter "**Commencement Date**").  Notwithstanding the foregoing, **New Services** and **Miscellaneous Professional Services** shall not include services performed as a(n):

accountant, actuary, architect, banker, builder, construction manager, contractor, doctor, engineer, franchisor, insurance company, investment banker, investment advisor, mortgage banker, nurse, physician, property developer, security broker/dealer, or structure settlement broker services.

As a condition presence tot coverage for **New Services** occurring or allegedly occurring after such fifteen day time period, the **Named Insured** shall, no later than fifteen (15) days after the **Commencement Date**:

1. give written notice of the **New Services** to the **Insurer** and provide a detailed description of such **New Services** to the **Insurer's** satisfaction in its sole and absolute discretion;

2. pay any additional premium required by the **Insurer** in its sole and absolute discretion; and

3. agree to any additional terms and conditions of this **Policy** as required by the **Insurer** in its sole an absolute discretion.

Coverage for such **New Services** shall automatically terminate as of 12:01 a.m. on the sixteenth day after the **Commencement Date** in the event: (i) the information listed directly above in this endorsement is not provided to the **Insurer** within fifteen (15) days after the **Commencement Date**; or (ii) the **Named Insured** does not agree to such additional terms and conditions as required by the **Insurer** and does not pay such additional premium within fifteen (15) days following the date on which the **Insurer** gives written notice of such additional premium and terms and conditions to the **Named Insured**.

All other terms and conditions of this **Policy** remain unchanged.

JOHN J. LUPICA, President

_____

Authorized Representative

# CONTINGENT BODILY INJURY/PHYSICAL DAMAGE ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **Sitel Worldwide Corporation** | | | 5 |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **EON** | **G24066496 002** | **04/01/2010 to 04/01/2011** | **04/01/2010** |
| Issued By (Name of Insurance Company) | | | |
| **Illinois Union Insurance Company** | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is agreed that the **Policy** is amended as follows:

1. Section III, Exclusions, subsection B, is deleted in its entirety and the following is inserted:

    B. alleging, based upon, arising out of or attributable to any **Bodily Injury** or **Property Damage**. However, this exclusion does not apply where such **Claim** results from a **Wrongful Act** committed by the **Insured** provided that:

    1) such bodily injury or property damage has arisen out of:

        a. the rendering or failure to render **Miscellaneous Professional Services** or **Technology Services**, or

        b. the failure of the **Insured's Technology Products** to perform the function or serve the purpose intended;

        and

    2) there is no other insurance policy issued by any insurer applicable to such **Claim**.

2. Section VI, Limits of Liability, is amended by adding the following:

    Solely with respect to that portion of any **Claim** attributable to **Bodily Injury** or **Property Damage** which is covered by this endorsement, the maximum Limit of Liability for all **Claims** in the aggregate shall be $5,000,000 aggregate. This limit is a sublimit which shall be part of and not in addition to the otherwise applicable aggregate **Limit of Liability** stated in Item 4C of the Declarations, and will in no way serve to increase the **Insurer's** maximum liability under the **Policy**.

All other terms and conditions of this **Policy** remain unchanged.

JOHN J. LUPICA, President

_____
Authorized Representative

NAFS 000027

## DEFENSE AND SETTLEMENT AMENDED ENDORSEMENT

| Named Insured<br>**Sitel Worldwide Corporation** | | | Endorsement Number<br>**6** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G24066496 002** | Policy Period<br>**04/01/2010 to 04/01/2011** | Effective Date of Endorsement<br>**04/01/2010** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is agreed that Section IX, Defense and Settlement, is amended by deleting subsection B in its entirety and inserting the following:

C. The **Insurer** shall not settle any **Claim** without the written consent of the **Named Insured**. If the **Named Insured** refuses to consent to a settlement or a compromise recommended by the **Insurer** and acceptable to the claimant, then the **Insurer's** Limit of Liability under this **Policy** with respect to such **Claim** shall be reduced to (i) the amount of **Damages** for which the **Claim** could have been settled plus all **Claims Expenses** incurred up to the time the **Insurer** made its recommendation to the **Named Insured**, plus (ii) 50% of all subsequent covered **Damages** and **Claims Expenses** in excess of such amount referenced in (i), the remaining 50% of which shall be borne by the **Insureds** uninsured and at their own risk. However, this subsection does not apply to any potential settlement that is within the Retention.

All other terms and conditions of this **Policy** remain unchanged.

JOHN J. LUPICA, President

_____
Authorized Representative

# TERMINATION OF THE POLICY AMENDED ENDORSEMENT

| Named Insured<br>**Sitel Worldwide Corporation** | | | Endorsement Number<br>*7* |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G24066496 002** | Policy Period<br>**04/01/2010 to 04/01/2011** | Effective Date of Endorsement<br>**04/01/2010** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is agreed that Section XIII, Termination of the **Policy**, is amended by deleting subsection A2.

All other terms and conditions of this **Policy** remain unchanged.

JOHN J. LUPICA, President

_____
Authorized Representative

# FUNDS TRANSFER ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Sitel Worldwide Corporation | | | 8 |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| EON | G24066496 002 | 04/01/2010 to 04/01/2011 | 04/01/2010 |
| Issued By (Name of Insurance Company) | | | |
| Illinois Union Insurance Company | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is agreed that Section II, Definitions, subsection E, **Damages**, is amended by adding the following directly after paragraph 8:

9.    funds, monies or securities (collectively, "**Funds**") or the value thereof (whether actual or estimated), including without limitation any loss of interest attributable to such **Funds**, transferred to or from any natural person or entity; and

10. any portion of any settlement, award, judgment or damages attributable to, or that reflects, the value (whether actual or estimated) of such **Funds** or lost interest.

As respects subparagraph 10 above, in the event any such settlement, award, judgment or damages is not expressly attributable to, or does not expressly reflect, the value of such **Funds**, then the **Insurer** and **Insureds** shall allocate between the portions of such settlement, award, judgment or damages attributable to such value and the portions that are not attributable to such value. Such allocation shall be based upon the **Wrongful Acts**, facts, circumstances, allegations and evidence underlying and/or presented in the **Claim**. If there can be no agreement on such allocation, the **Insurer** shall pay as **Damages** an amount which the **Insurer** believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated or judicially determined. Any negotiated, arbitrated or judicially determined allocation of such **Damages** on account of such **Claim** shall be applied retroactively to such **Claim** notwithstanding any prior advancement to the contrary. Any such allocation agreed to, negotiated, arbitrated, or judicially determined shall not apply to or create any presumption with respect to the allocation of other **Damages** on account of such **Claim** or any other **Claim**.

All other terms and conditions of this **Policy** remain unchanged.

JOHN J. LUPICA, President

_____
Authorized Representative

## ADDITIONAL INSURED PURSUANT TO CONTRACT ENDORSEMENT

| Named Insured Sitel Worldwide Corporation | | | | Endorsement Number 9 |
|---|---|---|---|---|
| Policy Symbol EON | Policy Number G24066496 002 | Policy Period 04/01/2010 to 04/01/2011 | | Effective Date of Endorsement 04/01/2010 |
| Issued By (Name of Insurance Company) Illinois Union Insurance Company | | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is agreed that:

1.  Section II, Definitions, subsection S, the definition of **Insured**, is amended by adding the following:

    **Insured** also means any client or customer of the **Named Insured**, but only if a written contract entered into by the **Named Insured** specifically requires that such client or customer be added as an additional **Insured** for professional liability or errors and omissions insurance, and only for **Claims** (i) first made on or after the effective date of this endorsement and (ii) for vicarious or imputed liability of such client or customer which results from **Wrongful Acts** committed solely by the **Named Insured**.

    The **Policy** will not provide coverage for any **Wrongful Act** committed by such client or customer referenced above which is added to this **Policy** as an additional **Insured**.

2.  Section III, Exclusions, is amended by deleting exclusion E, but solely with respect to **Claims** asserted by such client or customer referenced above for **Wrongful Acts** actually or allegedly committed by an **Insured** in the performance of or failure to perform **Professional Services**.

All other terms and conditions of this **Policy** remain unchanged.

JOHN J. LUPICA, President

Authorized Representative

# EMPLOYED LAWYERS COVERAGE ENDORSEMENT

| Named Insured<br>**Sitel Worldwide Corporation** | | | Endorsement Number<br>**10** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G24066496 002** | Policy Period<br>**04/01/2010  to 04/01/2011** | Effective Date of Endorsement<br>**04/01/2010** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is agreed that the **Policy** is amended as follows:

1. Section I, Insuring Agreements, subsection G, **Miscellaneous Professional Services** Liability, is amended as follows:

   Insuring Agreement G, **Miscellaneous Professional Services** Liability, shall also include the following:

   1. **Employed Lawyers' Coverage**

      The **Insurer** will pay on behalf of the **Employed Lawyer Damages** and **Claims Expenses** in excess of any applicable Retention which the **Employed Lawyer** shall become legally obligated to pay by reason of a **Claim** first made against the **Employed Lawyer** and reported to the **Insurer** in writing during the **Policy Period**, or, if elected, any **Extended Reporting Period**, for any **Wrongful Acts** in the **Employed Lawyer's** performance of or failure to perform **Miscellaneous Professional Services**, except to the extent that the **Named Insured** has indemnified the **Employed Lawyer** for such **Damages** or **Claim Expenses**. However, the **Wrongful Act** must have been committed on or subsequent to the **Retroactive Date** and before the end of the **Policy Period**.

   2. Indemnification of **Employed Lawyers** Coverage

      The **Insurer** will pay on behalf of the **Named Insured Damages** and **Claim Expenses** in excess of any applicable Retention for which the **Named Insured** is required or permitted by law to indemnify an **Employed Lawyer** by reason of a **Claim** first made against the **Employed Lawyer** and reported to the **Insurer** in writing during the **Policy Period**, or, if elected, any **Extended Reporting Period**, for any **Wrongful Acts** in the Employed Lawyer's performance of or failure to perform **Miscellaneous Professional Services**. However, the **Wrongful Act** must have been committed on or subsequent to the **Retroactive Date** and before the end of the **Policy Period**.

2. Solely with respect to **Employed Lawyers'** and Indemnification of **Employed Lawyers** Coverage provided by this endorsement, subsection II, Definitions, is amended as follows:

   a. The following definition is added:

      • **Employed Lawyer** means:

         1. those **Insureds** admitted to practice law who were, now are or shall be employed by the **Named Insured** as full time or part time salaried lawyers and independent contractors and who are natural persons, but solely while performing **Miscellaneous Professional Services** on behalf of the **Named Insured**;

         2. those employees of the **Named Insured** who are not admitted to practice law who were, now are, or shall be employed as assistants of any **Employed Lawyer** described  paragraph 1 above, but solely while acting under the direction and control of such **Employed Lawyer** performing **Miscellaneous Professional Services**.

b. Subsection Y, the definition of **Miscellaneous Professional Services**, is deleted in its entirety and the following is inserted:

Y. **Miscellaneous Professional Services** means only those services rendered by an **Employed Lawyer** as a lawyer, including eleemosynary (pro bono) services rendered with the approval and under the direction of the **Named Insured**.

3. Solely with respect to **Employed Lawyers'** and Indemnification of **Employed Lawyers** Coverage provided by this endorsement, Section III, Exclusions, is amended as follows:

a. The following exclusions are added:

- by, on behalf of, or for the benefit of the **Insured**, or by any security holder of the **Insured**, whether directly or derivatively, except where such **Claim** is made by a security holder of the **Insured** who is acting totally independently of, and totally without the solicitation, assistance, participation or intervention of the **Named Insured**;

- based on or arising out of, directly or indirectly, any actual or alleged discharge of an **Insured's** duties as director or officer of the **Named Insured**; provided, however, this exclusion shall not apply to the extent such **Claim** is for improperly rendering or failing to render **Miscellaneous Professional Services**.

- by or on behalf of any **Insured**, except and to the extent such **Claim** is in the form of a cross claim, third party claim or **demand** for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded under this **Policy**.

4. Solely with respect to **Employed Lawyers'** and Indemnification of **Employed Lawyers** Coverage provided by this endorsement, Section VI, Limits of Liability, is amended by adding the following:

The maximum limit of the **Insurer's** liability for all **Loss** in the aggregate arising from all **Claims** covered under Insuring Agreement G, **Employed Lawyers'** Coverage and Indemnification of **Employed Lawyers** Coverage, shall be $5,000,000 (hereinafter known as the **Sub-limit of Liability**). This **Sub-limit of Liability** shall be part of and not in addition to the otherwise applicable aggregate **Limits of Liability** stated in Item 4 of the Declarations, and will in no way serve to increase the **Insurer's** maximum liability under the **Policy**.

5. Solely with respect to **Employed Lawyers'** and Indemnification of **Employed Lawyers** Coverage provided by this endorsement, Section VII, Retention, subsection A is deleted in its entirety and the following is inserted:

A.

1. **Employed Lawyers'** Coverage Retention

Solely with respect to Insuring Agreement E1, **Employed Lawyers** Coverage, the **Insurer** shall only be liable for **Damages** or **Claim Expenses** which are in excess of the **Employed Lawyers** Retention specified below. This Retention shall apply to each **Wrongful Act** and shall be borne by the **Insureds** and remain uninsured, unless the **Insured** is contractually obligated to insure such Retention. For purposes of the Retention, **Claims** arising out of the same **Wrongful Act** or out of continuous, repeated or interrelated **Wrongful Acts** shall be considered as arising out of one **Wrongful Act**, and only one **Employed Lawyers** Retention amount shall apply thereto. This **Employed Lawyers** Retention is separate from and will not be used to satisfy the requirements of the Retention as otherwise set forth in Item 5 of the Declarations.

2. Indemnification of **Employed Lawyers** Retention

Solely with respect to Insuring Agreement E2, Indemnification of **Employed Lawyers** Coverage, the **Insurer** shall only be liable for **Damages** or **Claim Expenses** which are in excess of the Indemnification of **Employed Lawyers** Retention specified below. This Retention shall apply to each **Wrongful Act** and shall be borne by the **Insureds** and remain uninsured, unless the **Insured** is contractually obligated to insure such Retention. For purposes of the Retention, **Claims** arising out of the same **Wrongful Act** or out of continuous, repeated or interrelated **Wrongful Acts** shall be considered as arising out of one **Wrongful Act**, and only one Indemnification of **Employed Lawyers** Retention amount shall apply thereto. This Indemnification of **Employed Lawyers** Retention is separate from and will not be used to satisfy the requirements of the Retention as otherwise set forth in Item 5 of the Declarations.

<u>$0</u> **Employed Lawyers** Retention
<u>$25,000</u> Indemnification of **Employed Lawyers** Retention

All other terms and conditions of this **Policy** remain unchanged.

JOHN J. LUPICA, President

Authorized Representative

## SITEL WORLDWIDE CORP. ENHANCEMENT ENDORSEMENT

| Named Insured<br>**Sitel Worldwide Corporation** | | | Endorsement Number<br>**11** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G24066496 002** | Policy Period<br>**04/01/2010 to 04/01/2011** | Effective Date of Endorsement<br>**04/01/2010** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is agreed that the **Policy** is amended as follows:

1. Section I, Insuring Agreements, subsection E, the Identity Theft Public Relations Expense Fund agreement, is amended by deleting the phrase "**Crisis Management Expenses**" and inserting the phrase "**Notification Expenses and Crisis Management Expenses**".

2. Section II, Definitions, is amended as follows:

   a. Subsection C, the definition of **Application** is amended by inserting the phrase "within twelve (12) months prior to the inception of this **Policy**" immediately after the phrase "information and materials submitted".

   b. Subsection E, the definition of **Claim**, numbered paragraph 2, is amended by deleting the phrase "also, with respect to Insuring Agreement D" and inserting the phrase "also, with respect to Insuring Agreements C and D".

   c. Subsection H, the definition of **Crisis Management Expenses** is deleted in its entirety and the following is inserted:

      H. Crisis Management Expenses **means those reasonable and necessary expenses incurred by the** Insured **or which the** Insured **becomes reasonably obligated to pay:**

         1. **to retain third party computer forensics services to determine the scope of a failure of** Network Security**;**

         2. **in retaining the services of a public relations firm, crisis management firm or law firm for advertising or related communications solely for the purpose of protecting or restoring the** Insured's **reputation as a result of a** Wrongful Act**;**

         3. **to retain the services of a law firm solely to determine the** Insured's **indemnification rights under a written agreement with an independent contractor with respect to a** Wrongful Act **expressly covered under Insuring Agreement D of this Policy and actually or allegedly committed by such contractor; or**

         4. any other entity, with the **Insurer's** prior written consent.

   d. Subsection J, the definition of **Damages** is amended as follows:

      (i) numbered paragraph 2 is amended by inserting the phrase "imposed against the **Insured**" immediately after the phrase "penalties, or sanctions";

      (ii) the following sentence is added to the subsection:

         • With respect to Insuring Agreements C and D, **Damages** shall also include a **Consumer Redress Fund**.

   d. Subsection R, the definition of **Hacker Attack** is deleted in its entirety.

   e. Subsection S, the definition of **Insured**, is amended by deleting paragraphs 2 and 3 in their entirety and inserting the following:

2. **Subsidiaries** of the **Named Insured**, but only with respect to **Wrongful Acts** which occur while they are a **Subsidiary**;

3. any past, present or future principal, partner, officer, director, trustee, employee, leased employee or temporary employee of the **Named Insured** or **Subsidiary**, but only with respect to the commission of a **Wrongful Act** committed within the scope of such person's duties performed on behalf of the **Named Insured** or **Subsidiary**; and

f. Subsection T, the definition of **Insured's Computer System**, is amended by deleting the word "solely".

g. Subsection BB, the definition of **Network Operations Security**, is deleted in its entirety and the following is inserted:

BB. **Network Security** means those activities performed by the **Insured**, or by others on behalf of the **Insured**, to protect against **Unauthorized Access** to, **Unauthorized Use** of, a **Denial of Service Attack** directed against, or transmission of **Malicious Code** to the **Insured's Computer System**.

h. Subsection CC, the definition of **Personal Information**, is deleted in its entirety and the following is inserted:

CC. **Personal Information** means:

1. an individual's name, social security number, medical or healthcare data, other protected health information, drivers license number, state identification number, credit card number, debit card number, address, telephone number, account number, account histories, or passwords; and

2. other nonpublic personal information as defined in **Privacy Regulations**;

in any format. **Personal Information** shall not include information that is lawfully made available to the general public for any reason, including but not limited to information from federal, state or local government records

i. Subsection HH, the definition of **Privacy Regulations**, is deleted in its entirety and the following is inserted:

HH. **Privacy Regulations** means the following statutes and regulations associated with the care, custody, control or use of personally identifiable financial, medical or other sensitive information:

1. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191);

2. Gramm-Leach-Bliley Act of 1999;

3. the California Security Breach Notification Act (CA SB 1386);

4. Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), but solely for alleged violations of unfair or deceptive acts or practices in or affecting commerce, and

5. other similar state, federal, and foreign identity theft and privacy protection legislation that requires commercial entities that collect **Personal Information** to post privacy policies, adopt specific privacy or security controls, or notify individuals in the event that **Personal Information** has potentially been compromised.

j. Subsection JJ, the definition of **Regulatory Proceeding** is amended by deleting the phrase "Insuring Agreement D" and inserting the phrase "Insuring Agreements C or D".

k. Subsection SS, the definition of **Wrongful Act**, is amended by deleting numbered paragraph 3 in its entirety and inserting the following:

3. With respect only to Insuring Agreement C, resulting in a failure of **Network Security**, including such failure which results in a **Channel Attack**.

l. The following definitions are added:

- **Channel Attack** means:

1. the **Unauthorized Use** of or **Unauthorized Access** to the **Computer System** of a third party provided such **Unauthorized Access** or **Unauthorized Use** is attained through the **Insured's Computer System**;

NAFS 000036

    2.   the participation by the **Insured's Computer System** in a **Denial of Service Attack** directed against the **Computer System** of a third party; or

    3.   the transmission of **Malicious Code** from the **Insured's Computer System** to the **Computer System** of a third party.

- **Consumer Redress Fund** means a sum of money which the Insured is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding. Consumer Redress Fund** shall not include any sums paid which constitute taxes, fines, penalties, injunctions or sanctions.

- **Notification Expenses** means those reasonable and necessary expenses incurred by the **Insured** or which the **Insured** becomes reasonably obligated to pay:

    1.   to comply with **Privacy Regulations**, including but not limited to the consumer notification provisions of **Privacy Regulations** of the applicable jurisdiction that most favors coverage for such expenses;

    2.   with the **Insurer's** prior written consent, to voluntarily notify individuals whose **Personal Information** has been wrongfully disclosed; and

    3.   for credit monitoring services, but only if such disclosure of **Personal Information** could result in the opening of an unauthorized line of credit or other financial account.

3.   Section III, Exclusions, is amended as follows:

   a.   Subsection A is amended by deleting the last sentence of the subsection.

   b.   Subsections A and I are amended by adding the following:

      Solely with respect to the applicability of this exclusion under Insuring Agreements C and D, only facts pertaining to and knowledge possessed by any principal, partner, officer or director of an **Insured** shall be imputed to other **Insureds**

   c.   Subsection G is amended by adding the following:

      However, with respect to a **Wrongful Act** expressly covered under Insuring Agreements C or D, this exclusion shall not apply to a **Regulatory Proceeding** or **Consumer Redress Fund** for that portion of **Damages** or **Claims Expenses** allocated to numbered paragraph 4 of **Privacy Regulations**.

   d.   Subsection X is amended by adding the following:

      Further, with respect to a **Wrongful Act** expressly covered under Insuring Agreements C and D, this exclusion shall not apply to a **Regulatory Proceeding** or **Consumer Redress Fund** for that portion of **Damages** or **Claims Expenses** allocated to numbered paragraph 4 of **Privacy Regulations**.

   e.   Subsection BB is deleted in its entirety and replaced with the following:

      BB. alleging, based upon, arising out of or attributable to any unsolicited electronic dissemination of faxes, e-mails or other communications by or on behalf of the **Insured** to multiple actual or prospective customers of the **Insured** or any other third party, including but not limited to actions brought under the Telephone Consumer Protection Act, any federal or state anti-spam statutes, and/or any other federal or state statute, law or regulation relating to a person's or entity's right of seclusion. However, with respect to a **Wrongful Act** expressly covered under Insuring Agreement C, this exclusion shall not apply.

   f.   Subsection CC is amended by deleting the last sentence in the subsection and inserting the following in its place:

      However, with respect to a **Wrongful Act** expressly covered under Insuring Agreements C and D, this exclusion shall not apply to a **Regulatory Proceeding** or **Consumer Redress Fund** for that portion of **Damages** or **Claims Expenses** allocated to numbered paragraph 4 of **Privacy Regulations**.

   g.   Subsection EE is deleted in its entirety and replaced with the following:

EE. alleging, based upon, arising out of or attributable to the unauthorized or surreptitious collection of **Personal Information** by the **Insured** or the failure to provide adequate notice that such information

is being collected. Solely with respect to the applicability of this exclusion under Insuring Agreements C and D, only facts pertaining to and knowledge possessed by any principal, partner, officer, director or organizational equivalent of an **Insured** shall be imputed to other **Insureds**.

h. Subsection FF is deleted in its entirety and replaced with the following:

FF. alleging, based upon, arising out of or attributable to the **Insured's** intentional failure to disclose the loss of **Personal Information** in violation of any law or regulation. Solely with respect to the applicability of this exclusion under Insuring Agreements C and D, only facts pertaining to and knowledge possessed by any principal, partner, officer, director or organizational equivalent of an **Insured** shall be imputed to other **Insureds**.

i. The following exclusion is added:

- with respect to Insuring Agreements A and G only, alleging, based upon, arising out of, or attributable to any **Wrongful Act** covered under any one or more of Insuring Agreements C, D, or E, whether or not such Insuring Agreements are purchased.

4. Section IV, Estates, Legal Representatives and Spouses, is amended by deleting the phrase "**Crisis Management Expenses**" and inserting the phrase "**Crisis Management Expenses, Notification Expenses**" in lines eight and nine of the section.

5. Section VI, Limits of Liability, is amended as follows:

a. Subsection A, numbered paragraphs 2 and 4 are deleted in their entirety and the following numbered paragraphs 2 and 4 are inserted in their place respectively:

2. With respect to Insuring Agreement E:

a. the Each **Claim** Limit of Liability as stated in Item 4AEa of the Declarations is the **Insurer's** maximum liability under Insuring Agreement B for the sum of all **Notification Expenses** because of each **Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

b. the Each **Claim** Limit of Liability stated in Item 4AEb of the Declarations is the **Insurer's** maximum liability under Insuring Agreement B for the sum of all **Crisis Management Expenses** because of each **Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

c. the Aggregate Limit of Liability stated in Item 4AEa of the Declarations is the **Insurer's** maximum liability under Insuring Agreement B for the sum of all **Notification Expenses** because of all **Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

d. the Aggregate Limit of Liability stated in Item 4AEb of the Declarations is the **Insurer's** maximum liability under Insuring Agreement B for the sum of all **Crisis Management Expenses** because of all **Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

4. With respect to Insuring Agreements C & D only, and notwithstanding the otherwise applicable Each **Claim** and Aggregate Limits of Liability stated in Item 4A of the Declarations:

a. The Each **Claim Regulatory Proceeding** Sub-Limit of Liability stated in Item 4B of the Declarations is the **Insurer's** maximum liability under Insuring Agreements C and D for the sum of all **Damages** and all **Claims Expenses** incurred because of each **Regulatory Proceeding Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

b. The Aggregate **Regulatory Proceeding** Sub-Limit of Liability stated in Item 4B of the Declarations is the **Insurer's** maximum liability under Insuring Agreements C and D for the sum of all **Damages** and all **Claims Expenses** incurred because of all **Regulatory Proceeding Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

The **Regulatory Proceeding** Sub-Limit of Liability does not apply to any **Consumer Redress Fund** and shall be part of and not in addition to the otherwise applicable Each **Claim** or Aggre-

   c.   gate Limits of Liability stated in Item 4A or 4C of the Declarations, and will not increase the **Insurer's** Limit of Liability as provided therein.

  b.  Subsection B is amended by deleting the phrase "all **Crisis Management Expenses**" and inserting the phrase "all **Crisis Management Expenses, all Notification Expenses**".

  c.  Subsection C is amended by deleting the phrase "**Crisis Management Expense**" and inserting the phrase "**Crisis Management Expense, Notification Expense**".

6.  The phrase "**Crisis Management Expenses**" is deleted wherever it appears in the following sections of the **Policy**, and the phrase "**Crisis Management Expenses, Notification Expenses**" is inserted in its place.

  a.  Wherever it appears in Section IV, Estates, Legal Representatives and Spouses

  b.  Wherever it appears in Section VI, Limits of Liability, subsection A, numbered paragraph 6.

  c.  Wherever it appears in Section VI, Limits of Liability, subsections C, and D.

  d.  Wherever it appears in Section VII, Retention.

  e.  Where it appears in Section IX, Defense and Settlement, subsection C.

  f.  Wherever it appears in Section X, Other Insurance.

  g.  Wherever it appears in Section XIV, Territory and Valuation

7.  The phrase "**Network Operations Security**" is deleted wherever it appears in the Declarations and **Policy**, and the phrase "**Network Security**" is inserted in its place

8.  Section IX, Defense and Settlement, is amended as follows:

  a.  Subsection A is amended by deleting the last sentence of the subsection and inserting the following:

    A.  The **Insured** shall not admit or assume liability or settle or negotiate to settle any **Claim** or incur any **Claims Expenses, Crisis Management Expenses** (as defined in section II, subsection H1c of this **Policy**), **Extortion Monies**, or **Extortion Expenses** without the prior written consent of the **Insurer**, and the **Insurer** shall have the right to appoint counsel and to make such investigation and defense of a covered **Claim** as it deems necessary.

  b.  Subsection B is amended by deleting the phrase "**Damages and Claims Expenses**" and inserting the phrase "**Damages, Claims Expenses, Crisis Management Expenses, Notification Expenses, Extortion Monies, and Extortion Expenses**"

  c.  The following paragraph is added:

    It is agreed that, except with respect to that part of **Notification Expenses** set forth in the definition of **Notification Expenses**, numbered paragraph 2, directly above in this endorsement, the **Insured** has the right to incur **Notification Expenses** and **Crisis Management Expenses** without the **Insurer's** prior consent. However, the **Insurer** shall, at its sole discretion and in good faith, reimburse the **Insured** only for such expenses that the **Insurer** deems to be reasonable and necessary.

All other terms and conditions of this **Policy** remain unchanged.

JOHN J. LUPICA, President

_____

Authorized Representative

# MPL INSURING AGREEMENT ENDORSEMENT

| Named Insured<br>**Sitel Worldwide Corporation** | | | Endorsement Number<br>11 |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G24066496 002** | Policy Period<br>**04/01/2010  to 04/01/2011** | Effective Date of Endorsement<br>**04/01/2010** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

It is agreed that the **Policy** is amended as follows:

1.  It is agreed that Section II, Definitions, definition SS, **Wrongful Act**, is amended by deleting paragraph 7 in its entirety and replacing it with the following:

    7.  With respect only to Insuring Agreement G, in the **Insured's** rendering or failure to render **Miscellaneous Professional Services** to others for a fee or other compensation, including, but not limited to, any violation of the Fair Credit Reporting Act 15 U.S.C. Section 1681, et. seq. ("FCRA"), or the Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. Section 1692, et. seq., or any similar laws of any state of the United States of America, or any amendments to such Acts, or any code changes, or any similar laws of any other country.

2.  Solely with respect to coverage provided by this endorsement for **FCRA Claims**, Section VI, Limits of Liability, is amended by adding the following:

    The maximum limit of the **Insurer's** liability for all **Loss** in the aggregate arising from all **FCRA Claims** covered under Insuring Agreement G shall be $5,000,000 (hereinafter known as the **Sub-limit of Liability**). This **Sub-limit of Liability** shall be part of and not in addition to the otherwise applicable aggregate **Limits of Liability** stated in Item 4 of the Declarations, and will in no way serve to increase the **Insurer's** maximum liability under the **Policy**.

3.  Solely with respect to coverage provided by this endorsement for **FCRA Claims**, Item 5, Retention, is amended as follows:

    <u>$50,000</u>  each **FCRA Claim**, except for **Class Action FCRA Claims**
    <u>$250,000</u>  each **Class Action FCRA Claim**

Solely for purposes of this endorsement:

**FCRA Claim** means any **Claim** alleging, based upon, arising out of, or attributable to, in whole or in part, any violation of the Fair Credit Reporting Act 15 U.S.C. Section 1681, et. seq. ("FCRA"), or the Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. Section 1692, et. seq., or any similar laws of any state of the United States of America, or any amendments to such Acts, or any code changes, or any similar laws of any other country.

**Class Action FCRA Claim** means any **FCRA Claim** brought by or on behalf of a class or putative class of persons and/or entities, whether or not a class action is certified.

All other terms and conditions of this **Policy** remain unchanged.

JOHN J. LUPICA, President
_____
Authorized Representative

# APPENDIX C



**ace usa**

ACE USA Prof. Risk
P.O. 5105
Scranton, PA 18505-0518

Overnight Only
140 Broadway, 40th floor
New York NY 10005

(646) 458-6801   *phone*
(646) 458-6906   *fax*
(646) 458-7000   *main*

thomas.santangelo@acegroup.com
www.acegroup.com

*Thomas J. Santangelo*
*Claims Specialist*

**VIA CERTIFIED MAIL RRR AND EMAIL**
7007 2560 0003 3416 2903

September 28, 2010

Paul F. Labaki, Esq.
National Action Financial Services, Inc.
Lawrence Bell Drive, Suite 100
Williamsville, NY 14221
plabaki@nafs.net

| | |
|---|---|
| *Insured:* | *Sitel Worldwide Corporation* |
| *Policy No.:* | *EON G24066496 002* |
| *Claimant:* | *Cleve Cotton* |
| *Claim No.:* | *JY10J0396572* |

Dear Mr. Labaki:

This letter is to further acknowledge receipt of correspondence whereby ACE USA, Inc. ("ACE"), on behalf of Illinois Union Insurance Company ("the Company") was advised of the above-captioned matter. The insured, Sitel Worldwide Corporation ("Sitel") is requesting coverage under its Digital Technology and Professional Liability Policy. If the Insured is seeking coverage under any other policies issued by the Company, please let me know as soon as possible.

A claim file has been established under the Policy, with the assigned claim number of JY10J0396572. Please refer to this claim number on all future correspondence regarding this matter, and direct all correspondence to my attention.

The purpose of this letter is to advise you that based upon a review of the materials provided to ACE, we have determined that the Policy <u>does not provide coverage for this Claim and, thus, the Company has no obligation to defend and indemnify the Insured.</u>

**SUMMARY OF CLAIM**

Please understand that ACE, on behalf of the Company, has not made any determination as to the validity of the above-referenced matter, nor do we assert that any liability exists. We reference the allegations herein only to describe the matter submitted for coverage.

On or about July 28, 2010, Cleve Cotton ("Cotton" or "plaintiff") filed suit in the United States District Court for the Northern District of Illinois against National Action Financial Services ("NAFS"). The suit,

*One of the ACE Group of Insurance & Reinsurance Companies*



**ace usa**

which is characterized as a Class Action, alleges violation of the Telephone Consumer Protection Act, 47 U.S.C. section 227 ("TCPA"). Plaintiff maintains that, pursuant to NAFS' attempts to collect from plaintiff an alleged Capital One debt, he received a series of automated telephone messages on the voicemail associated with his cell phone. He further contends that he did not authorize the placement of the calls to his cell phone, nor did he furnish his cell phone number to NAFS or the creditor. Plaintiff seeks statutory damages, an injunction against further violations, costs of suit, and other unspecified relief.

## THE POLICY

The Company issued a Digital Technology & Professional Liability Policy to Sitel Worldwide Corporation for the Policy Period of April 1, 2010 to April 1, 2011. The Policy provides Limits of Liability in the amount of $15,000,000 per claim and in the aggregate ($5,000,000 for FCRA claims covered under Insuring Agreement G, pursuant to Endorsement Number 11). Pursuant to Item 5 of the Declarations, there is a $1,000,000 per claim retention ($50,000 for non-class action FCRA claims; $250,000 for class action FCRA claims, pursuant to Endorsement Number 11), which is applicable to Damages and Claims Expense. Please note that Claims Expenses are included in the Policy's Limit of Liability and the payment of Claims Expenses erodes the Policy's available Limit of Liability.

With respect to the above allegations, we note the following relevant Policy provisions:

    I.    INSURING AGREEMENTS

        G.    **Miscellaneous Professional Services Liability**

            If Insuring Agreement G, **Miscellaneous Professional Services Liability** coverage, is purchased pursuant to Item 3 of the Declarations, the **Insurer** will pay **Damages** and **Claims Expenses** of the **Insured** which the **Insured** becomes legally obligated to pay by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, **Notice**, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

Please now refer to Section II. DEFINITIONS, which outlines the meaning of the following terms:

        E.    **Claim** *[as amended by Endorsement Number 11]* means:

            1.    with respect to Insuring Agreements A, B, C, D, and G:

                a.  a written demand against any **Insured** for monetary or non-monetary damages;

Page 2/7

NAFS 000042



**ace usa**

      b.  a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

      c.  an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief;

2.    also, with respect to Insuring Agreements C and D only, a **Regulatory Proceeding**;

3.    with respect to E, a written report by the **Insured** to the **Insurer** of an actual or alleged violation of any **Privacy Regulations** by the **Insured**;

4.    with respect to Insuring Agreement F, a **Cyber Extortion Threat**,

including any appeal therefrom.

**F.**    **Claims Expenses** means:

5.    reasonable and necessary attorneys' fees, expert witness fees and other fees and costs incurred by the **Insurer**, or by the **Insured** with the **Insurer's** prior written consent, in the investigation and defense of a covered **Claim**;

6.    reasonable and necessary premiums for any appeal bond, attachment bond or similar bond, provided the **Insurer** shall have no obligation to apply for or furnish such bond; and

7.    prejudgment and post judgment interest awarded in any **Claim**.

**Claims Expenses** shall not include wages, salaries, fees or costs of directors, officers or employees of the **Insurer** or the **Insured**.

**J.**    **Damages** *[as amended by Endorsement Number 11]* means compensatory damages, any award of prejudgment or post-judgment interest, and settlements which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against any **Insured** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for **Wrongful Acts** to which this **Policy** applies. **Damages** shall not include:

1.    any amount for which the **Insured** is not financially liable or legally obligated to pay;

2.    taxes, fines, penalties, or sanctions imposed against the **Insured**;

3.    matters uninsurable under the laws pursuant to which this **Policy** is construed;

4.    the cost to comply with any injunctive or other non-monetary or declaratory relief, including specific performance, or any agreement to provide such relief;

5.    loss of fees or profits by the **Insured**, return of fees, commissions or royalties by the **Insured**, or re-performance of services by the **Insured** or under the **Insured's** supervision;

6.    disgorgement of any profit, remuneration or financial advantage to which any **Insured** was not legally entitled;

NAFS 000043



## ace usa

7. penalties of any nature, however denominated, arising by contract; and

8. any amounts other than those intended solely to compensate for a loss caused by a **Wrongful Act.**

**Damages** include punitive and exemplary damages to the extent such damages are insurable under the most favorable internal laws of any jurisdiction which has a substantial relationship to the **Insured**, the **Insurer**, this **Policy** or such **Claim.**

S.    **Insured** *[as amended by Endorsement Number 11]* means:

1. The **Named Insured**;

2. **Subsidiaries** of the **Named Insured**, but only with respect to **Wrongful Acts** which occur while they are a **Subsidiary**;

3. any past, present or future principal, partner, officer, director, trustee, employee, leased employee or temporary employee of the **Named Insured** or **Subsidiary**, but only with respect to the commission of a **Wrongful Act** committed within the scope of such person's duties performed on behalf of the **Named Insured** or **Subsidiary**; and

4. independent contractors of the **Named Insured** or of a **Subsidiary** who are natural persons, but only with respect to the commission of a **Wrongful Act** within the scope of such person's duties performed on behalf of the **Named Insured** or **Subsidiary.**

Z.    **Miscellaneous Professional Services** *[as amended by Endorsement Number 4]* means only those services specified in Item 8 of the Declarations and performed for others for a fee by the **Insured**, or by any person or entity acting on behalf of the **Insured**. **Miscellaneous Professional Services** do not include **Technology Services, Electronic Media Activities** or **Network Operations Security.** Solely with respect to those services:

1. that the **Insured**, or any person or entity acting on behalf of the **Insured**, first commences to perform for other for a fee or other compensation after the effective date of this endorsement and that were never performed by the **Insured** or such person or entity prior to such date (hereinafter "**New Services**"); and

2. solely in the even such **New Services** are not specified in Item 8 of the Declarations,

then such **New Services** are included in the definition of **Miscellaneous Professional Services** provided that such services occurred or allegedly occurred within fifteen (15) days after the date on which the **Insured**, or any person or entity acting on behalf of the **Insured**, first commences to perform such **New Services** for others for a fee or other compensation (hereinafter "**Commencement Date**'). Notwithstanding the foregoing, **New Services** and **Miscellaneous Professional Services** shall not include services performed as a(n):

NAFS 000044



**ace usa**

accountant, actuary, architect, banker, builder, construction manager, contractor, doctor, engineer, franchisor, insurance company, investment banker, investment advisor, mortgage banker, nurse, physician, property developer, security broker/dealer, or structure settlement broker services.

As a condition presence tot coverage for New Services occurring or allegedly occurring after such fifteen day time period, the Named Insured shall, no later than fifteen (15) days after the Commencement Date:

1.  give written notice of the New Services to the Insurer and provide a detailed description of such New Services to the Insurer's satisfaction in its sole and absolute discretion;

2.  pay any additional premium required by the Insurer in its sole and absolute discretion; and

3.  agree to any additional terms and conditions of this Policy as required by the Insurer in its sole an absolute discretion.

Coverage for such New Services shall automatically terminate as of 12:01 a.m. on the sixteenth day after the Commencement Date in the event: (i) the information listed directly above in this endorsement is not provided to the Insurer within fifteen (15) days after the Commencement Date; or (ii) the Named Insured does not agree to such additional terms and conditions as required by the Insurer and does not pay such additional premium within fifteen (15) days following the date on which the Insurer gives written notice of such additional premium and terms and conditions to the Named Insured.

SS.   Wrongful Act *[as amended by Endorsement Number 11]* means any error, misstatement, misleading statement, act, omission, neglect, breach of duty, or **Personal Injury** offense actually or allegedly committed or attempted by any **Insured** in their capacity as such, or by any other **Insured** solely in the performance of duties for the **Named Insured:**

7.  With respect only to Insuring Agreement G, in the **Insured's** rendering or failure to render **Miscellaneous Professional Services** to others for a fee or other compensation, including, but not limited to, any violation of the Fair Credit Reporting Act 15 U.S.C. Sectoin 1681, et seq. ("FCRA"), or the Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. Section 1692, et seq., or any similar laws of any state of the United States of America, or any amendments to such Acts, or any code changes, or any similar laws of any other country.

*** 

Please refer now to Section III. EXCLUSIONS, which provides in pertinent part:

NAFS 000045



## ace usa

The Insurer shall not be liable for Damages, Claims Expenses, Crisis Management Expenses, Extortion Monies, or Extortion Expenses on account of any Claim:

BB. *[as amended by Endorsement Number 11]* alleging, based upon, arising out of or attributable to any unsolicited electronic dissemination of faxes, e-mails or other communications by or on behalf of the Insured to multiple actual or prospective customers of the Insured or any other third party, including but not limited to actions brought under the Telephone Consumer Protection Act, any federal or state anti-spam statutes, and/or any other federal or state statute, law or regulation relating to a person's or entity's right of seclusion. However, with respect to a **Wrongful Act** expressly covered under Insuring Agreement C, this exclusion shall not apply.

*** 

## COVERAGE POSITION

Based upon a preliminary review of the claim materials received to date in light of the terms, conditions, provisions and exclusions of the above-referenced policy, and subject to further investigation of all of the relevant facts and circumstances, <u>the Company advises that there is no coverage for this claim</u>.

Plaintiff's Complaint alleges violation of the Telephone Consumer Protection Act. Exclusion BB operates to bar coverage for claims, such as this, that pertain to "unsolicited electronic dissemination of faxes, emails or other communications by or on behalf of the Insured to multiple actual or prospective customers of the Insured or any other third party, <u>including but not limited to actions brought under the Telephone Consumer Protection Act</u> ...." (emphasis added). As a result, the Policy cannot respond with coverage.

Accordingly, we recommend that you report this matter to any insurance carrier that may afford coverage.

Please note that you may request a reevaluation of our coverage position. Any requests for reevaluation should be accompanied by additional factual information, documentation and/or legal precedent which you believe may apply. It should be directed to my attention. In the event of a reevaluation, the Company reserves all rights under the Policy. Nothing herein shall be construed as a waiver of such rights.

ACE reserves the right to deny coverage based upon grounds other than those expressly set forth in this letter and to supplement and/or amend this letter to address additional coverage issues as they may arise, based upon all the provisions, terms, conditions, exclusions, endorsements and definitions found in the Policy and additional facts that may come to ACE's attention. By the same token, ACE will take into consideration any additional information that you provide. Nothing stated herein and no further action taken by ACE or on its behalf should be construed as a waiver of any of its rights under the Policy. On the contrary, by providing this or any prior correspondence to the Insured, engaging in any prior or future discussions with the Insured, or paying or agreeing to pay any amount to or on or behalf of the Insured, ACE does not waive any rights that it has under the Policy, at law or in equity and understands the Insured reserves its rights as well.

Page 6/7

NAFS 000046



**ace usa**

Should you have any questions, please contact me directly at (646) 458-6801 or via email at thomas.santangelo@acegroup.com. Thank you for your cooperation in this matter.

Very truly yours,

Thomas J. Santangelo
Claims Specialist
ACE Professional Risk

c:   Christine Ogale *[VIA EMAIL ONLY]*
     Marsh USA, Inc.
     Christine.ogale@marsh.com

     Cathy Taylor *[VIA EMAIL ONLY]*
     Marsh USA, Inc.
     Cathy.R.Taylor@marsh.com

Page 7/7

NAFS 000047